UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

UNITED STATES OF AMERICA

V.                                                    CRIMINAL NO. 3:18-CR-234-DPJ-LRA

JOSHUA MONTREZ HORTON

ORDER

Defendant Joshua Horton seeks an order suppressing the handgun found in his car.  Mot.
[17].  Cognizant of the "duty zealously to protect individuals from abridgements of their rights to
liberty and privacy," the Court finds that the evidence should be suppressed.  *United States v.
Berry*, 670 F.2d 583, 590 (5th Cir. 1982) (en banc).

I.      Background

Horton is a convicted felon based on a previous accessory-after-the-fact charge.  On
November 2, 2016, he was found with a firearm and drugs while sitting in his parked car.  More
than three years later, he was indicted in this case for violating 18 U.S.C. § 922(g)(1), which
prohibits convicted felons from possessing firearms.

Horton now seeks to suppress the firearm, claiming that former Jackson Police
Department (JPD) Officer Eric Stanton used his marked police cruiser to block Horton from
pulling out of a parking space and therefore seized Horton under the Fourth Amendment.  The
parties agree that Stanton lacked probable cause or even reasonable suspicion to stop Horton.
That leaves two questions:  (1) did Stanton use his marked police cruiser to block Horton's
vehicle from leaving the parking lot and (2) if so, does that legally constitute a seizure.  The
issues have been fully briefed, and the parties participated in an evidentiary hearing on October
1, 2020.

II.     Findings of Fact

Around 11:40 a.m. on November 2, 2016, Horton and his girlfriend had just left their hotel room at the Roadway Inn in Jackson, Mississippi, and were sitting in Horton's Chevy Caprice with the engine running.  Horton had backed his car into a parking space a short distance from their room, and he was about to drive off because his girlfriend was late for work.  Defense Exhibit 3 depicts how and where Horton parked that day:



About that same time, Stanton pulled into the parking lot to answer a call for assistance from JPD Corporal Reginald Craft.  Craft was conducting a preventative sweep on the north side of the hotel and spotted what he thought might be criminal activity in a different car.  What Craft ultimately found was two workers smoking cigarettes on a break.

Stanton does not recall which entrance he used to access the Roadway Inn's parking lot but testified that he saw Horton sitting in his vehicle with the engine running.  Stanton observed Horton for at most 10 to 15 seconds before stopping his cruiser to question him.  Stanton did not activate his blue lights or siren, but Horton believed he had been detained.  According to Stanton, Horton stated at the scene, "[Y]ou didn't have a reason to stop me." Tr. at 13.[1]  Horton's statement to Stanton tends to corroborate his testimony that he was in the process of leaving.

---

[1] The Court obtained a rough copy of the hearing transcript from the court reporter; citations in this Order are to that transcript.  In the event the transcript is finalized for filing in the record, the page citations may not match up exactly with those pinpoint citations.

Where Stanton stopped his cruiser is the threshold factual question, and unfortunately, the evidence is unclear.  Horton testified that Stanton parked directly in front of the Caprice—about five feet from its front bumper—thereby blocking Horton from pulling forward; a fence prevented Horton from backing up.  Horton's version is depicted in Defense Exhibit 4, where the Caprice is colored green and the cruiser is blue:



For his part, Stanton could not remember whether he blocked Horton's vehicle.  He conceded that it was possible but said that he would have had no reason to do so.  The Government's other witness, Craft, arrived to assist Stanton after the contraband was discovered. So the position of Craft's vehicle is not an issue regarding the pre-probable cause seizure.  That said, Craft professed a crystal-clear recollection of where Stanton parked on November 2, 2016, and he drew the following diagram that was introduced as Defense Exhibit 1:



In this drawing, Craft's cruiser is above Horton's Caprice and Stanton's cruiser is below, essentially sandwiching Defendant's vehicle.  Like everyone else, Craft agreed that Horton was

backed into the space.  If Craft's account is accurate, Horton was not blocked, though his exit may have been partially impeded.

Reconciling these stories is not easy.  Craft and Horton described the position of Stanton's cruiser in mutually exclusive ways—Horton says he was blocked, and Craft says he was not.  Stanton does not recall enough to say either way, but his testimony contradicts Craft's in three material ways.

First, Craft testified that Stanton approached Horton from the north, while Stanton's testimony suggested that he approached from the south.  There is no dispute that Craft was stopped in the parking lot to the north of the hotel.  To approach Horton from the north as Craft claimed, Stanton would necessarily have first passed Craft.  *See supra* Def. Ex. 4.  Yet Stanton repeatedly testified that he did not:

> Q.     But you were headed to assist at the time I believe his title was Officer Craft?
>
> A.     That's correct.
>
> Q.     And so why didn't you -- or did you make it to Craft?
>
> A.     I did not.
>
> Q.     And why didn't you?
>
> A.     I can't recall why I didn't make it to Craft[.]  I believe it was because I understood at that time it was not an urgent situation or that other officers had arrived on the scene but I can't recall why I did not make it to corporal Craft.
>
> Q.     May be [sic] I'll ask it this way then.  You say that you were at that hotel to assist Craft?
>
> A.     That's correct.
>
> Q.      But you stopped before assisting Craft?
>
> A.     That's correct.

Q.      And so I guess then describe what's going on in your mind then.  What are
you seeing to make you stop before you get to Craft?

A.      Again I just see two individuals backed into the parking spot.

Tr. at 9–10.

If Stanton never reached Craft, then he approached Horton from the south.  This is

significant because the way Craft described the position of Stanton's parked cruiser is possible

only if Craft is correct that Stanton approached from the north.  Defense Exhibit 1—the top of

which is north—is again helpful:



And that raises the second inconsistency.  Craft testified that Stanton pulled about

halfway into the parking space.  Yet Stanton said otherwise on direct examination:

Q.      And so I have one question I do need to ask you and then we're going to
follow up on that:  when you stopped did you pull into a parking space?

A.      I did not[,] no.

*Id.* at 11–12.

The third contradiction is similar.  As Craft described Stanton's parked position,

Stanton's driver's side door would have been adjacent to Horton's driver's side door because the

vehicles were somewhat parallel facing opposite directions.  But Horton testified that Stanton

was parked perpendicular to his Caprice, which forced Stanton to walk around the back of his

cruiser to reach Horton.  *Id.* at 57.  Stanton said something similar:  "Exited my vehicle [and]

*walked around* to his driver's side door." *Id.* at 12 (emphasis added). In Craft's version, there was nothing to walk around.

From a credibility standpoint, Horton has an obvious incentive to lie. In the four years since this arrest, he claims to have rebuilt his life and is now gainfully employed as a truck driver. Indeed, he is on bond and working. He also understands the significance of this ruling having acknowledged that the case could be dismissed if the Court suppresses the firearm. As for Stanton, there is much he does not remember, but that is not necessarily his fault. Stanton was asked to provide details about a routine arrest he made nearly four years ago when working for a different employer. Notably, Stanton was careful not to stretch in areas he could not recall, which increases his credibility regarding the things he did remember—much of which contradicted Craft.

Craft is a more difficult assessment. While the Court did not sense that he was lying, it must question whether his testimony was accurate. Craft recalled in detail—and with no reservation—where Stanton parked his cruiser on November 2, 2016. As noted, this testimony comes nearly four years later, it was a routine matter, and Craft made no report to supplement his memory because it was not his stop. He also testified that in 2016 he averaged around 20 arrests per week. *Id.* at 51–52. In the four years since, Craft would have had hundreds—if not thousands—of stops. Finally, when questioned about other felony arrests that occurred around this same time, he could offer no details.

There are people with astounding memories, and perhaps Craft is one of them. But his inability to recall details about other crimes hurts his credibility. And while he may believe his testimony to be true, the Court cannot credit it—especially since it conflicts with the details Stanton credibly recalled. Ultimately, the Government carries the burden, and it has not proven

6

Horton's path was unobstructed. Stanton's car was blocking Horton from moving forward, and Horton could not move backward because of the fence.[2]

Finally, there is some agreement and some disagreement about how Stanton approached Horton's vehicle after parking his cruiser. There is no dispute that Stanton exited his cruiser "immediately" after stopping. *Id.* at 26. He was in uniform, and his sidearm was visible but not drawn, though he may have had his hand on it. Stanton does not remember giving any verbal commands, and Horton's testimony seems to confirm that. It also seems that Stanton had little ground to cover between his driver's side door and Horton's. Horton says Stanton ran as he approached; Stanton testified that he could not recall whether he was running, but "nothing about this stop would stand out to say I needed to run." *Id.* at 12. Based on Stanton's testimony about what he saw, there would be no reason for him to run to Horton. On the other hand, he was close enough to Horton's vehicle to reach it in short order, meaning there was little time between Stanton stopping his cruiser and arriving at Horton's door.

III.    Conclusions of Law

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend IV. When, as in this case, "the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

---

[2] Even assuming Craft was correct, it still seems that Horton's vehicle would have had to drive around Stanton to leave.

There was no search warrant in this case, and the parties agree that Stanton lacked a reasonable suspicion to conduct a *Terry* stop. *Terry v. Ohio*, 392 U.S. 1, 34 (1968). As a result, if Stanton seized Horton, the stop violated the Fourth Amendment. But "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Id.* at 19 n.16. "Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' . . . would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices. The [United States Supreme] Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Thus, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place [or] by asking him if he is willing to answer some questions." *Florida v. Royer*, 460 U.S. 491, 497 (1983) (plurality opinion). Finally, "the fact that the officers' conduct 'could be somewhat intimidating' does not mean a seizure has occurred." *United States v. Valdiosera-Godinez*, 932 F.2d 1093, 1099 (5th Cir. 1991) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 575 (1988)).

Whether such encounters become seizures turns on an objective test, under which the Court asks whether, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Mendenhall*, 446 U.S. at 554. This test is "concerned not with the citizen's subjective perception or the officers' subjective intent, but only with what the officers' words and actions would have conveyed to a reasonable and innocent person." *United States v. Mask*, 330 F.3d 330, 336 (5th Cir. 2003). A seizure occurs "only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of [the] citizen." *Terry*, 392 U.S. at 19. Non-exclusive considerations

8

include:  "(1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with an officer's request might be compelled."  *Mask*, 330 F.3d at 337 (citing *Mendenhall*, 446 U.S. at 554).

These examples suggest that Horton was not seized, because it was just Stanton at first, his weapon was visible but not drawn, he did not touch Horton, and there is no evidence he said anything as he approached.  But as noted, the examples are not exclusive.  Significantly, Horton says Stanton prevented him from leaving.

Numerous courts have grappled with similar issues, but a line of Fifth Circuit cases suggests that a reasonable person in Horton's shoes would not believe he could leave.  In *United States v. Beck*, officers conducting a routine patrol in a high-crime area saw a car parked on the left side of the road with the driver's door to the curb; the engine was running.  602 F.2d 726, 727 (5th Cir. 1979).  The offers pulled alongside the vehicle—apparently in close proximity— and started asking questions.  *Id.*  The Fifth Circuit concluded that the officers seized the driver defendant.

> When Spears and Gober interrupted their patrol by pulling alongside the parked Chevrolet, they clearly took the sort of action contemplated by *Terry v. Ohio*, in its definition of a "stop": "whenever a police officer accosts an individual and restrains his freedom to walk away, he has (stopped) that person." [392 U.S.] at 16. . . .  By pulling so close to the Chevrolet, the officers effectively restrained the movement of Beck and his passenger . . . ; from the record it is readily apparent that they were not free to ignore the officers and proceed on their way.

602 F.2d at 728–29 (internal citations omitted) (punctuation altered).  On its face, *Beck* is a close factual fit.  Even though the defendant/driver there could have opened his door and exited—or perhaps driven forward—the court still found a detention.

Though *Beck* was decided the year before *Mendenhall*, that may be a distinction without a difference; *Beck* seems to apply the same framework adopted by the *Mendenhall* plurality.  For example, the *Beck* court utilized a totality-of-the-circumstances test.  *Id.* at 729.  And this Court assumes *Beck* applied an objective standard to the seizure question.  Granted, the Fifth Circuit did not use that language when holding that it was "readily apparent that they were 'not free to ignore the officer(s) and proceed on (their) way.'"  *Id.* at 729 (quoting *United States v. Elmore*, 595 F.2d 1036, 1041 (5th Cir. 1979)).  But the *Elmore* case that *Beck* quotes used "a reasonable man test of 'whether the person was under a reasonable impression that he (was) not free to leave.'"  595 F.2d at 1042 (quoting *United States v. Wylie*, 569 F.2d 62, 67 (D.C. Cir. 1977)); *see also United States v. Bowles*, 625 F.2d 526, 530 (5th Cir. 1980) (noting that *Elmore* applied objective test).  Finally, although the *Beck* court did not have the benefit of the examples listed in the *Mendenhall* plurality, 446 U.S. at 554, the Fifth Circuit seemed aware of such considerations when it decided *Beck*, having listed some of them in *Elmore*.  595 F.2d at 1040 (considering whether officers used "physical force or show of authority").

Two post-*Mendenhall* cases from the Fifth Circuit are consistent with *Beck*, though they both arose in an airport.  First, the Fifth Circuit considered restraint of a suspect's movement in *Bowles*.  There, state and federal officers at the Atlanta airport noticed three suspicious passengers deplaning a non-stop flight from Los Angeles.  625 F.2d at 528.  One of the suspects, Bowles, was walking down a concourse when an agent passed and "turned toward [Bowles], standing in his line of travel."  *Id.* at 529.  The agent asked Bowles a few questions at that point and sought consent to search.  *Id.*  The Fifth Circuit concluded that "'any restraint on movement' is sufficient to constitute a seizure."  *Id.* at 531 (quoting *United States v. Robinson*, 535 F.2d 881, 883 & n.2 (5th Cir. 1976)).  Accordingly, "Bowles was seized" because the officer "pursued

10

Bowles, he passed his quarry, held out his credentials and turned to face defendant, blocking his path and stopping him from proceeding further.  Clearly at this point Bowles' movement had been restrained."  *Id.* at 532.

The Fifth Circuit quickly revisited *Bowles* in *United States v. Berry*, another airport-arrest case where officers saw suspicious passengers deplaning a flight from Miami.  670 F.2d at 588.  The officers approached the passengers for questioning outside the terminal as they were taking their luggage to a taxi stand.  *Id.*  The *Berry* court noted that both Fifth Circuit and Supreme Court precedent in this area was hard to reconcile.  The court therefore took the opportunity to "clarify" en banc.  *Id.* at 594.  Applying the *Mendenhall* objective test, the court "conclude[d] that, in looking to the totality of circumstances of an airport stop, a court should closely scrutinize whether those circumstances reveal the presence of any coercion.  If such coercion was present, the court must hold that a reasonable person would believe that his freedom had been limited."  *Id.* at 597.  While the court noted that it could not "catalog" the factors that might reveal coercion, it reaffirmed *Bowles* and noted "that blocking an individual's path or otherwise intercepting him to prevent his progress in any way is a consideration of great, and probably decisive, significance."  *Id.*

The *Berry* opinion addresses the standards for airport stops.  *Id.* at 594.  And that setting certainly differs from the parking lot at the Roadway Inn.  But the Fifth Circuit has applied *Berry* more broadly.  For example, in *Keller v. Fleming*, the officer used his patrol car to prevent the defendant from walking down the highway.  952 F.3d 216, 223 (5th Cir. 2020).  The court noted that the officer "interrupted [the individual's] path and 'intercept[ed] him to prevent his progress'—which is 'probably decisive' in assessing seizure."  *Id.* (quoting *Berry*, 670 F.2d at 597); *see also United States v. Valdiosera-Godinez*, 932 F.2d 1093, 1099 (5th Cir. 1991) (finding

no seizure during investigation of storage unit where officers "parked far enough away from the storage unit that the automobile inside could have been driven out") (citing *Berry*, 670 F.2d at 597).

The Supreme Court has likewise considered the impact of blocking a defendant's progress.  In *Michigan v. Chesternut*, the Court found no seizure where the suspect claimed to have been "chased" by a squad car because "[t]he record d[id] not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or that they operated the car in an aggressive manner *to block respondent's course*."  486 U.S. 567, 575 (1988) (emphasis added).

The Court readily acknowledges that seizure cases are fact specific and sometimes split hairs when distinguishing earlier holdings.  For example, in *United States v. Thompson*, the Tenth Circuit distinguished *Berry* and cases like it that "refer to blocking an individual's path *while he is on foot*."  546 F.3d 1223, 1229 (10th Cir. 2008) (emphasis added).

It is not, therefore, surprising that some cases support the Government's argument while others do not.  *Compare United States v. Kim*, 25 F.3d 1426, 1430 (9th Cir. 1994) (finding no seizure when DEA agent partially blocked defendant's vehicle from exiting shopping center because DEA agent did not otherwise engage in coercive tactics), *with United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) ("Given the fact that Williams blocked See's car with his marked patrol car, a reasonable person in See's position would not have felt free to leave").[3]

---

[3] The Fifth Circuit came close to addressing this issue under similar facts in *United States v. Ardoin*, 454 F. App'x 385, 386 (5th Cir. 2011).  There, the defendant contended that he had been seized when "officers intend[ing] to conduct a knock and talk investigation . . . encountered him in his vehicle as he attempted to leave his residence."  *Id.*  The defendant argued "that the encounter was more akin to a traffic stop and ripened into a seizure when the officers blocked his vehicle from exiting the driveway."  *Id.*  No facts are identical, but *Ardoin* is pretty close.  The Fifth Circuit concluded that whether Ardoin was seized "present[ed] a close question."  *Id.* at 387.  But it was able to avoid that question by finding that reasonable suspicion existed.  *Id.*

12

At bottom, this is a fact-specific determination based on the totality of the circumstances. *Mendenhall*, 446 U.S. 544, 554.  Here, Horton cranked his car to leave, but a reasonable person would not pull out in front of Stanton's cruiser once he entered the parking lot.  After observing Horton for at most 10 to 15 seconds, Stanton parked his cruiser in a way that effectively pinned Horton between the cruiser and the fence.  And while the Government says Horton could have simply exited his vehicle and walked away, there was little time for that because Stanton parked just off Horton's front bumper and immediately walked around the back of the cruiser toward Horton.  By the time Horton could have killed the engine and exited, Stanton would have been there.  Returning to the legal standard, would a reasonable person who had started his engine and was about to pull out of a parking lot, but was then blocked by a marked police cruiser and saw a uniformed and armed police officer approaching the driver's side door believe he was free to exit his car and walk away?  He would not.

The Court does not reach this conclusion lightly, and it does not like the idea that Horton may evade punishment for a felony offense he admits committing.  But the Constitution is larger than Horton or the case against him.  Indeed the Fourth Amendment is "[a]mong our most cherished constitutional rights."  *Berry*, 670 F.2d at 589.  "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."  *Id.* at 590 (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

Finally, while this ruling may affect the Government's case against Horton, the Court is not concerned that it will dampen legitimate governmental interests or law-enforcement practices.  As noted, there was no reasonable suspicion that Horton had done anything wrong

when he was seized.  Stanton himself testified that he was just "curious" what Horton was doing in those 10 to 15 seconds.  Tr. at 29.  Curiosity is not enough to detain someone on the street, and any interest officers have in such circumstances is greatly outweighed by the infringement.[4]

IV.    Conclusion

For the reasons stated, the Court grants Defendant's Motion to Suppress [17].  In doing so, the Court has considered all of the Government's arguments except those waived during the evidentiary hearing.  Those not expressly addressed would not have altered the result.

**SO ORDERED AND ADJUDGED** this the 7th day of October, 2020.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE

---

[4] In fact, Craft testified that JPD trains its officers not to block vehicles absent at least reasonable suspicion.  *See id.* at 38, 40–41, 42, 53.]